IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| JOHN H. HARMON, II, | CV 18-145-BLG-TJC |
| Plaintiff, | |
| vs. | **ORDER** |
| ANDREW SAUL, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff John H. Harmon, II, ("Harmon") filed a complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") regarding the denial of claims for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and for Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. §§ 1381-83f. (Doc. 2.) The Commissioner subsequently filed the Administrative Record ("A.R."). (Doc. 7.)

Presently before the Court is Harmon's motion for summary judgment, seeking reversal of the Commissioner's denial, and remand for an award of disability benefits, or alternatively for further administrative proceedings. (Doc. 11.) The motion is fully briefed and ripe for the Court's review.[1] (Docs. 11-13.)

---

[1] In his reply brief, Harmon takes issue with the Commissioner's responsive brief. Harmon contends the Commissioner has not provided "a statement of facts which

For the reasons set forth herein, and after careful consideration of the record and the applicable law, the Court finds the ALJ's decision should be **AFFIRMED**.

## I.    PROCEDURAL BACKGROUND

In August 2004, Harmon began receiving "Child-Disabled" benefits.  (A.R. 77.)  His disability benefits were continued in April 2011.  (A.R. 56.)  On June 2, 2016, however, the Social Security Administration ("SSA") determined Harmon was no longer disabled.  (A.R. 95-99.)

The SSA denied Harmon's request for reconsideration on February 15, 2017. (A.R. 112-115.)  On March 2, 2017, Harmon filed a written request for a hearing.  (A.R. 118-122.)  The hearing was held before Administrative Law Judge Richard A. Opp (the "ALJ") on October 11, 2017.  (A.R. 30-51.)  The ALJ issued a decision finding Harmon not disabled on November 30, 2017.  (A.R. 12-24.)

On August 27, 2018, the Appeals Council denied review of the ALJ's decision.  (A.R. 1.)  Thereafter, Harmon timely filed the instant action.  (Doc. 2.)

/ / /

---

support Defendant's argument" as required by Local Rule 78.2(b).  (Doc. 13 at 2.) Harmon further argues this failure warrants taking his Statement of Facts as true and remanding for an award of benefits.  The Court is not persuaded.  The Commissioner's brief complies with the substantive requirements of the Local Rules.  Even if the Commissioner's brief fell short of the Local Rules, "a motion for summary judgment cannot be granted simply because the opposing party violated a local rule."  *Marshall v. Gates*, 44 F.3d 722, 725 (9th Cir. 1995).  As such, the Court will address the issues presented on their merits.

## II.    LEGAL STANDARDS

### A.    Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Court must affirm the Commissioner's decision unless it "is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may reverse the ALJ's decision to deny benefits only if it is based upon legal error or is not supported by substantial evidence"); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten*, 44 F.3d at 1457. In considering the record as a whole, the Court must weigh both the evidence that supports and detracts from the ALJ's conclusions. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975). The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational

interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary."). However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (quoting *Tackett v. Apfel,* 180 F.3d 1094, 1097 (9th Cir. 1999).

**B.     Determination of Continuing Disability**

The Commissioner is required to periodically review continued entitlement to benefits. 20 C.F.R. §§ 404.1594(a), 416.994(a). Disability benefits can be terminated if: (1) there has been medical improvement in the claimant's impairments, and (2) the medical improvement is related to the claimant's ability to work. 20 C.F.R. §§ 404.1594(a), 416.994(b). Medical improvement is defined as "any decrease in the medical severity" of the claimant's impairments, and "is determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs, or laboratory findings associated with that impairment(s)." 20 C.F.R. §§ 404.1594(c)(1); 416.994(b)(1)(i). Even where medical improvement related to the claimant's ability to work has occurred, the Commissioner must also show that the

claimant is currently able to engage in substantial gainful activity before a finding of no longer disabled.  20 C.F.R. §§ 404.1594(a), (b)(3), 416.994(b)(1)(iii).

The Commissioner makes the assessment of continuing disability through an eight-step evaluation process to consider Title II claims (person disabled since childhood) under 20 C.F.R. § 404.1594 and a seven-step process for Title XVI claims (disabled adult) under 20 C.F.R. § 416.994.  The two processes are identical except the eight-step evaluation process includes an initial determination of whether the claimant is engaging in substantial activity, whereas the seven-step process does not.  20 C.F.R. §§ 404.1594(f)(1)-(8) and 416.994(b)(5)(i)-(vii).  The remaining steps in the process are: (2) whether the claimant has an impairment or combination of impairments which meets the criteria of a listed impairment; (3) whether medical improvement has occurred; (4) whether the medical improvement is related to the claimant's ability to do work; (5) whether an exception to medical improvement applies; (6) whether all the current impairments are severe; (7) what the claimant's residual functional capacity is and whether the claimant can perform past relevant work; and (8) whether other work exists in significant numbers that the claimant can perform.  20 C.F.R. §§ 404.1594(f)(2)-(8); 416.994(b)(5)(i)-(vii).

/ / /

/ / /

/ / /

## III.   FACTUAL BACKGROUND

### A.   Hearing

The ALJ began the hearing by noting Harmon was not represented, and asking him if he understood that he had the right to have a representative present. (A.R. 32-33.)  Harmon said yes.  (A.R. 33.)  The ALJ asked Harmon if it was his intention to proceed without representation.  (*Id.*)  Harmon responded that he did not know who to call for a representative and said further that he was not informed ahead of time that he would need a representative.  (*Id.*)  The ALJ clarified that Harmon did not necessarily need a representative present but that it is an option, and then asked Harmon if he wished to proceed.  (*Id.*)  Harmon said yes.  (*Id.*)

Harmon testified that he was disabled, but was told via a letter that his symptoms had improved to where he was able to work.  (*Id.*)  Harmon disagreed with that finding and said his tremors had gotten worse.  (*Id.*)  Harmon also stated that his bipolar disorder was not better either, but "about the same as it's always been."  (A.R. 34.)  Harmon asserted that his tremors affect his ability to "keep a hold of stuff," and that he drops plates at home.  (*Id.*)  Harmon said he no longer plays video games because he lacks "precision to play the game controls." (A.R. 35.)  Harmon stated that the only games he plays are ones "where you just tap your phone with your finger."  (*Id.*)  Instead, Harmon said he watches DVDs "all day, every day."  (*Id.*)

Harmon testified that he has lived by himself at the Ponderosa Acres in Billings, Montana since his parents passed away. (A.R. 35-36.) Harmon said he couldn't keep up his parents' house after they died, so his cousin helped him apply for low income housing. (A.R. 36.) The ALJ inquired whether he has any friends he sees face-to-face, to which Harmon said no. (A.R. 37.)

The ALJ asked Harmon about his education. (A.R. 41.) Harmon testified that he did not graduate from high school. (*Id.*) When asked what his reading/grade level was, Harmon replied "low level books, like even second grader or a first grader could read them." (A.R. 42.) Harmon stated he does not read anything more complicated, like newspapers or magazines, except that he subscribed to Game Informer, but noted it was "mostly pictures and titles for new games." (*Id.*) The ALJ confirmed that Harmon was enrolled in special education in high school. (A.R. 44.) The ALJ asked if Harmon had a driver's license, and he said no. (*Id.*) The ALJ asked if he had taken the driver's test and Harmon confirmed he had taken the written portion, and passed, but not the driver's test. (A.R. 45.)

The ALJ also inquired about employment. Harmon said he could not fill out job applications on his own. (A.R. 42.) The ALJ asked about his job at the Lodge Grass IGA. (A.R. 43.) Harmon stated his job was "facing" product labels forward on shelves until he had a disagreement with the boss "so they cut me loose." (*Id.*)

The ALJ inquired about Harmon's time working for Community Option Resource, Enterprise, Inc., to which Harmon said he didn't know what the ALJ was talking about. (*Id.*) Harmon said he had worked for two or maybe four days for Cloud Peak Energy painting a deck and mowing, but he moved and "had no way of getting back down there." (A.R. 44.)

Harmon's uncle, Richard Mullenberg also testified. (A.R. 38.) Mullenberg stated that Harmon has trouble filling out applications, such as for food stamps, answering questions, and dealing with aggressive people, and often needs help from him or his daughters "when it comes to important stuff." (A.R. 39.)

### B. Medical Evidence

#### 1. *Barry Wohl, M.D.*

Barry Wohl, M.D., of Northeast Wyoming Pediatric Associates, was Harmon's physician from May 15, 2010 to March 23, 2016. (A.R. 433-435, 442-443, 449-455, 479-481.) Dr. Wohl's last examination notes from March 23, 2016, stated that Harmon's chief complaint was bipolar disorder and tremors. (A.R. 479.) The duration of Harmon's conditions were noted as "Continuous" and severity "Mild." (*Id.*) Dr. Wohl's notes indicated that Harmon "[i]s happy with medications. Denies any concerns or worries today. Is still having tremors, 'the same' per [Harmon]." (*Id.*) Dr. Wohl's final assessment was that Harmon's

bipolar condition was stable, and he had developmental delay and essential tremors.  (A.R. 480.)

2.    *Kirsten L. Morissette, M.D.*

Harmon established care with Kirsten L. Morissette, M.D. of St. Vincent's Healthcare on April 6, 2016.  (A.R. 483.)  Dr. Morissette's initial assessment was that Harmon's bipolar disorder was in full remission.  (*Id.*)  Dr. Morissette noted Harmon had essential tremors.  (*Id.*)  Dr. Morissette also noted that Harmon reported that his bipolar disorder and essential tremor were well managed with current medications.  (*Id.*)

Dr. Morrissette next saw Harmon on September 18, 2016, and again assessed that his bipolar disorder was in full remission and noted essential tremors.  (A.R. 485.)  Harmon reported he felt his mood was well-controlled and denied significant depression and mania.  (*Id.*)

On May 24, 2017, Dr. Morissette completed mental and physical Medical Source Statements.  (A.R. 515-523.)  With regard to mental limitations, she opined Harmon had mild limitations in the ability to understand and remember and carry out simple instructions, and moderate limitations with regard to complex instructions.  (A.R. 515.)  She said it was difficult for Harmon to understand complex instructions, and said he was unable to complete paperwork without assistance.  (*Id.*)  Dr. Morrissette found Harmon had only mild limitations with

regard to interacting with the public, supervisors and co-workers, but moderate limitations in the ability to respond appropriately to changes in routine in a work setting. (A.R. 516.) She said his interactions with the public, supervisors and coworkers would be difficult because he has trouble recognizing emotions in others. (*Id.*) She also opined he has difficulties with attention to detail and concentration. (*Id.*) As to physical limitations, she indicated Harmon did not have any limitations with the use of his hands. (A.R. 520.)

3.   *F. Tom Peterson, Ed.D.*

F. Tom Peterson, Ed.D, a licensed clinical psychologist, examined Harmon on April 13, 2016 on referral from Montana Department of Public Health and Human Services, Disability Determination Services. (A.R. 466.) As to Harmon's ability to engage in work-related activity, Dr. Peterson found Harmon possesses adequate intellect and general awareness to engage in work-related activity. (A.R. 473.) But Dr. Peterson also found that Harmon presented as "highly amotivated," and that his medications may be adversely affecting his level of awareness and energy. (*Id.*) Dr. Peterson noted that if Harmon's childhood diagnosis of Attention Deficit Hyperactive Disorder was accurate, then he should have a positive response to stimulant medication. (*Id.*) Dr. Peterson remarked that given Harmon's low level of energy and motivation he could not endure traditional work-related activity, but with adjustment to his medication, among other things,

he should be able to acquire the requisite physical and cognitive skills necessary for routine work. (*Id.*) Dr. Peterson suggested Harmon is a good candidate for a mid-range sheltered workshop placement and, in the event Harmon responds to proper medication, he may be suited for training designed for competitive employment. (*Id.*)

## C. The ALJ's Findings

The ALJ followed the eight-step evaluation process to consider Harmon's Title II claim under 20 C.F.R. § 404.1594 and the seven-step process for the Title XVI claim under 20 C.F.R. § 416.994. (A.R. 12.)

First, the ALJ found that Harmon had not engaged in substantial gainful activity through the date of decision. (A.R. 14.) Second, the ALJ found Harmon's current impairments include a history of attention-deficit hyperactivity disorder, bipolar disorder, tremors, and morbid obesity, but determined they do not meet or medically equal any of the impairments in the Listing of Impairments. (*Id.*) Third, the ALJ found medical improvement had occurred, and the improvement was related to the ability to work. (A.R. 15-16.) Next, the ALJ found Harmon has the residual functional capacity to perform medium work, "except: He can never work on ladders, ropes or scaffolds or balance on a narrow surface. He can frequently stoop, kneel, crouch and crawl. He can frequently handle, finger and feel. He must avoid concentrated exposure to unprotected heights and working around

hazardous moving machinery.  He can understand, remember and carry[] out short and simple instructions, and he cannot work directly with the public." (*Id.*)  Last, the ALJ found that Harmon is able to perform a significant number of jobs in the national economy.  (A.R. 23.)  Thus, the ALJ found Harmon was not disabled as of June 2, 2016.  (A.R. 24.)

## IV.    DISCUSSION

Harmon argues the ALJ erred in the following ways: (1) failing to adequately advise him of his right to representation; (2) failing to develop the record; (3) improperly discounting the opinion of Dr. Peterson; (4) improperly finding his testimony non-credible relative to tremors; and (5) failing to incorporate all of his impairments into the vocational expert's hypothetical questioning.

### A.    Notice of the Right to Representation

Harmon asserts he was incapable of making an informed decision about whether to proceed without representation at the hearing because of his low IQ and impaired intellectual functioning.  He therefore argues his waiver of representation was faulty and the hearing should have been continued to allow him to obtain an attorney.  The Commissioner counters Harmon received notice of his right to representation twice before the hearing, chose to proceed without a representative, and signed a waiver of his right to representation at the hearing.

Under 42 U.S.C. § 406(c), the Commissioner must notify claimants of options for obtaining attorneys for representation in presenting their case. The "notification must also advise the claimant of the availability to qualifying claimants of legal services organizations which provide legal services free of charge." 42 U.S.C. § 406(c); *see also* 20 C.F.R. § 404.1706. In *Roberts v. Comm'r of Soc. Sec.*, the Ninth Circuit rejected elevated disclosure requirements for representation adopted by the Fifth, Seventh, and Eleventh Circuits that went above and beyond that which is required by § 406(c). *Roberts v. Comm'r of the Soc. Sec.*, 644 F.3d 931, 934 (9th Cir. 2011). The Ninth Circuit instead followed the Second Circuit's reasoning in *Lamay v. Comm'r of Soc. Sec.*, which noted the enhanced disclosure requirements adopted by other appellate courts predated the 1991 effective date of § 406(c) and, further, that social security hearings were not adversarial in nature. *Id.* (citing *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508 (2d Cir. 2009)). Coupled with the ALJ's duty to develop the record in *pro se* cases, the Ninth Circuit held the limited requirements found in § 406(c) were adequate. *Id.*

Here, the Commissioner provided Harmon written notice of the right to representation twice, initially on April 20, 2017 and again on June 30, 2017. (A.R. 125-127, 145-151.) The April notice included a list of legal services organizations he could contact for attorney referral services and/or free legal help. (A.R. 131.)

13

Then, at the hearing, the ALJ noted Harmon was not represented and asked him whether he understood he had the right to have a representative. (A.R. 32-33.) Harmon answered "yes." (A.R. 33.) The ALJ asked if it was Harmon's intention to go forward with the hearing that day without representation. (*Id.*) At that point Harmon stated he would not know who to call for a representative. (*Id.*) Harmon said: "I was not informed ahead of time that I would need a representative." (*Id.*) The ALJ then clarified that he was not saying Harmon *needed* a representative. (*Id.*) "I'm just saying it's an option and you understand it's an option, so do you want to have your hearing today?" (*Id.*) Harmon again answered in the affirmative, "yes." (*Id.*)

Harmon also signed a waiver of representation. (A.R 167.) Harmon argues the waiver is faulty because he didn't understand it, and the ALJ failed to consider whether he was capable of making an informed choice about representation. Harmon relies on the SSA Hearings, Appeals, and Litigation Law Manual ("HALLEX"), which states the "ALJ will confirm during the opening statement . . . that the claimant was properly advised of the right to representation, . . . and that the claimant is capable of making an informed choice about representation." HALLEX I-2-1-80, 2018 WL 6528001, *2 (2018). Harmon's argument is unavailing. The Ninth Circuit has held that HALLEX "does not 'carry the force of law and [is] not binding upon the agency.' Therefore, we do not 'review

allegations of non-compliance with [its] provisions.'" *Roberts*, 644 F.3d at 933

(quoting *Parra v. Astrue*, 481 F.3d 742, 749 (9th Cir. 2007).

Further, the "lack of counsel does not affect the validity of the hearing

unless the plaintiff can demonstrate prejudice or unfairness in the administrative

proceedings." *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir.1985) (citing *Vidal v.*

*Harris*, 637 F.2d 710, 713 (9th Cir.1981)). Harmon has not made that showing

here.

Accordingly, the Court finds that Harmon was adequately informed of his

right to representation, and the AJ did not err by proceeding with the hearing after

Harmon waived his right to representation.

### B. The ALJ's Duty to Develop the Record

Harmon next argues the ALJ failed to develop the record. Harmon contends

that although he testified about working for Community Option Resource

Enterprises, Inc. ("COR"), the ALJ did not obtain any records from COR. Harmon

asserts that if the ALJ had obtained the vocational records, the ALJ would not have

determined his testimony about his symptoms was inconsistent with the medical

evidence. The Commissioner argues Harmon has failed to show why obtaining

additional vocational records from COR was necessary.

"Social Security proceedings are inquisitorial rather than adversarial." *Sims*

*v. Apfel*, 530 U.S. 103, 110 (2000); *Roberts*, 644 F.3d at 934. As such, the ALJ

"has an independent 'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (citing *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)). This duty exists regardless of whether the claimant is represented. *Id.* "When the claimant is unrepresented, however, the ALJ must be especially diligent in exploring for all the relevant facts." *Id.* The duty is further heightened when "the claimant may be mentally ill and thus unable to protect her own interests." *Id.* (citing *Higbee v. Sullivan*, 975 F.2d 558, 562 (9th Cir. 1992)). Nevertheless, the ALJ's duty to further develop the record "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). Moreover, "the claimant must 'demonstrate prejudice or unfairness' to set aside an ALJ's decision for failure to develop the record." *Molina v. Shalala*, 77 F.3d 489 (9th Cir. 1996) (citing *Cruz v. Schweiker,* 645 F.2d 812, 814 (9th Cir.1981).

It has not been shown that the duty to develop the record has been triggered here. Harmon does not explain why the record is ambiguous or inadequate to allow for a proper evaluation of the evidence. The only alleged omission from the record is the failure to obtain records from COR, which apparently relate to Harmon's employment with Cloud Peak Energy. But Harmon testified at the

hearing that he was employed by Cloud Peak for only two-four days, mowing their lawn and painting their deck. After moving to a different location, he was unable to return to that employment. It is not at all apparent why evidence regarding this very short-term employment would resolve any ambiguity in the record, or why the record is inadequate in its absence.[2]

At any rate, even if the ALJ's duty to develop extended to obtaining Harmon's COR records, any error in failing to obtain them in this case was harmless. The ALJ noted several discrepancies between Harmon's testimony and the evidence of record. Among these, Harmon testified that he could not fill out a job application. (A.R. 17.) But the ALJ discredited Harmon's testimony,

---

[2] In determining whether a claimant's disability has ended, the ALJ is required to consider both medical and non-medical evidence in the record. *See* 20 C.F.R. §§ 404.1594(b)(6); 416.994(b)(vi). But the regulations pertain to the duty to develop the claimant's "complete medical history," which means "the records of [the claimant's] medical source(s)." 20 C.F.R. §§ 404.1512(b)(1); 416.912(b)(1); 404.1545(a)(3); 416.945(a)(3). The vocational records from COR are not medical records from a medical source. 20 C.F.R. §§ 404.1502(e); 416.902(j). Other courts have held that similar records fall outside the scope of the ALJ's duty to develop the record. *See e.g. Corporan v. Comm'r of Soc. Sec.*, 2015 WL 321832, *7 (S.D.N.Y. Jan. 23, 2015) (finding records from children's services did not qualify as medical evidence, and were thus outside the scope of the duty to develop the record); *Rosa v. Comm'r of Soc. Sec.*, 2018 WL 5621778, *11 (S.D.N.Y Aug. 13, 2018) (finding the ALJ did not breach the duty to develop by not obtaining school counseling records because school counselors are not medical sources). Since the duty to develop the record was not triggered in this case, it is not necessary to determine whether the duty extends to nonmedical, vocational records in these circumstances.

reasoning that "it is unclear how the claimant would know this given that he has not applied for jobs recently." (A.R. 17.) Harmon speculates the COR records might have shown that COR or some other vocational program had assisted him in applying for part-time or short-term jobs, thereby bolstering his credibility.

The Court notes, however, that there is other evidence in the record that supports Harmon's testimony that he could not fill out a job application. For example, Harmon testified that his cousin helped him apply for low income housing because he could not fill the forms out himself. (A.R. 36.) Harmon's uncle also testified that Harmon "has a lot of trouble filling out applications, like for HRDC and food stamps" and that either he or his daughters need to help him. (A.R. 39.) It appears a nurse also assisted Harmon with filling out the February 24, 2016 Function Report (A.R. 221-228), and Dr. Morissette noted Harmon "was unable to fill out any of his paperwork without the assistance of my medical assistant." (A.R. 515.) As such, there was adequate evidence in the record to allow for proper evaluation of Harmon's credibility on this point.

The Court therefore finds the ALJ did not err by failing to develop the record.

/ / /

/ / /

/ / /

### C.     The ALJ's Evaluation of the Consultative Psychological Examiner

Harmon argues the ALJ improperly discounted the opinion of Dr. Peterson. The Commissioner responds that the ALJ properly gave only partial weight to Dr. Peterson's opinion.

In assessing a disability claim, an ALJ may rely on "opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995.)  The Commissioner applies a hierarchy of deference to these three types of opinions.  The opinion of a treating doctor is generally entitled to the greatest weight.  *Id*. *See also* 20 C.F.R. § 404.1527(c)(2). "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." *Lester*, 81 F.3d at 830.  "The Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician." *Id.*  Even when contradicted by another doctor, the opinion of an examining physician can only be rejected for specific and legitimate reasons with substantial evidence in the record in support. *Id.* at 830-31.

Here, the ALJ found Dr. Peterson's assessment was not fully persuasive. Specifically, the ALJ agreed with Dr. Peterson's opinion that Harmon possesses

adequate intellect and general awareness to engage in work-related activity. (A.R. 20.) But the ALJ found the record did not support Dr. Peterson's opinions that an adjustment in treatment was necessary for Harmon to engage in sustained work activity, or that there was a need for a sheltered workplace. (A.R. 20-21.)

The ALJ's reasons for giving Dr. Peterson's opinion only partial weight were: (1) the treatment records did not support the level of impairment described by Dr. Peterson; and (2) Harmon's activities of daily living contradicted Dr. Peterson's opinion that Harmon's lack of motivation and interest would hinder traditional work-related activity. (A.R. 19-21.) These are valid reasons for not fully crediting the opinion. An ALJ may reject a physician's opinion if it is inconsistent with evidence of a claimant's treatment or with other medical evidence in the record. *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001). An ALJ may also discount a physician's opinion on grounds that is inconsistent with the claimant's own admitted daily activities. *Morgan v. Comm'r of Soc. Sec.,* 169 F.3d 595, 600-02 (9th Cir.1999); *Massanari*, 261 F.3d at 856.

The ALJ's reasons are also supported by the evidence in the record. Regarding the treatment records, the ALJ accurately noted they showed Harmon's mental health symptoms were sufficiently controlled with Seroquel. He was

without mental health complaints (A.R. 479, 483, 485), and his mental status examination findings were unremarkable (A.R. 479, 480, 484, 486). Further, with regard to activities of daily living, the record supports the ALJ's observations that Harmon had the ability to interact with others (A.R. 225, 470), to go out in public (A.R. 222, 224, 470, 479), and to sustain attention and concentration (A.R. 225, 468).

Moreover, the ALJ acknowledged the limitations noted by Dr. Peterson, such as the sedating effects of Seroquel and Harmon's history of ADHD, by including mental health limitations in the RFC. (A.R. 21.) The ALJ limited Harmon to understanding, remembering and carrying out only simple instructions and restricting him from working with the public. (A.R. 16, 21.) These limitations are consistent with those noted by his treating physician, Dr. Morissette. (*See* A.R. 515-17 (opining Harmon had difficulties understanding complex instructions, interacting with the public, and with attention to details and concentration).

Harmon essentially asks the Court to re-weigh the medical evidence and arrive at a conclusion different from the AJL. But the Court is not permitted to do so. Where the evidence is susceptible to more than one rational interpretation, as it is here, the Court must uphold the AJL's decision. *Burch*, 400 F.3d at 679; *Flaten*, 44 F.3d at 1457.

Accordingly, the Court finds no error regarding Dr. Peterson's opinion.

### D.     The ALJ's Credibility Determination

Harmon argues the ALJ improperly discounted the credibility of his testimony relating to his tremors.  The Commissioner contends the ALJ provided specific, clear, and convincing reasons to reject Harmon's testimony.

The credibility of a claimant's testimony is analyzed in two steps.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged.  *Id.*  Second, if the claimant meets the first step, and there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if she provides "specific, clear and convincing reasons" for doing so.  *Id.*  "In order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'"  *Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010).  "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Reddick v. Chater*, 157 F.3d at 722 (quoting *Lester*, 81 F.3d at 834)).

To assess a claimant's credibility, the ALJ may consider (1) ordinary credibility techniques, (2) unexplained or inadequately explained failure to seek or

follow treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *Fair v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989). An ALJ may also take the lack of objective medical evidence into consideration when assessing credibility. *Baston v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

Here, the first step of the credibility analysis is not at issue. Therefore, the question is whether the ALJ provided clear and convincing reasons for rejecting Harmon's testimony regarding his tremors. The Court finds the ALJ did so.

The ALJ found that despite Harmon's testimony that his tremors were worse, there is no objective medical evidence indicating worsening tremors or tremors of such severity that Harmon could not use his hands. (A.R. 17-18.) The ALJ noted that Harmon's medical records did not contain any objective examination evidence of tremors. (A.R. 18.) This observation is supported in the record. (*See e.g.* A.R. 426-27, 479-80, 483-84, 485-86, 520.) The ALJ also found Harmon's testimony was inconsistent with the evidence showing he spends a considerable amount of time playing video/computer games and that he has no apparent difficulties with activities of daily living. (A.R. 18.) Again, the ALJ's reason was supported by the record. (*See* A.R. 222-23, 225, 468, 470, 523.)

Although this Court may not evaluate the evidence in the same way as the ALJ, the Court may not substitute its own interpretation of the evidence for the

ALJ's interpretation.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

Therefore, the Court finds that the ALJ's credibility finding is properly supported

by specific, clear and convincing reasons.

###    E.    The ALJ's Failure to Incorporate Impairments into Hypothetical Questions Posed to the Vocational Expert.

Hypothetical questions posed to the vocational expert must set out all the

limitations and restrictions of the particular claimant.  *Embrey v. Bowen*, 849 F.2d

418, 422 (9th Cir. 1988).  "The testimony of a vocational expert 'is valuable only

to the extent that it is supported by medical evidence.'"  *Magallanes*, 881 F.2d 747,

756 (9th Cir. 189) (quoting *Sample*, 694 F.2d 639, 644 (9th Cir. 1982)).  If the

assumptions in the hypothetical are not supported by the record, then the

vocational expert's opinion that the claimant has a residual working capacity has

no evidentiary value.  *Embrey*, 849 F.2d at 422

Harmon argues that the ALJ's hypothetical did not include all of his

impairments.  As discussed above, the Court has determined the ALJ adequately

supported his reasons for discounting Harmon's testimony and the medical source

evidence.  Accordingly, the hypotheticals the ALJ relied on properly accounted for

all of Harmon's limitations that the ALJ found credible and supported by evidence

in the record.

Therefore, the Court finds the ALJ's determination at step five is supported

by substantial evidence.

## V.     CONCLUSION

Based on the foregoing,  **IT IS ORDERED** that the ALJ's decision is

**AFFIRMED**, and Harmon's motion for summary judgment (Doc. 11) is

**DENIED**.

**IT IS ORDERED**.

DATED this 31st day of March, 2020.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge